FILED

2024 Oct-25  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION**

|  |  |  |
|---|---|---|
| **JERRY ODEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:** |
| **v.** | ) | |
| | ) | **Jury Trial Demanded** |
| **YESCARE, CORP.** | ) | |
| **and** | ) | |
| **DR. JASON FISH,** *individually*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>COMPLAINT</u>

Plaintiff Jerry Oden brings this action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights. Plaintiff seeks injunctive relief, compensatory and punitive damages, attorneys' fees, expenses and costs, and any other relief the Court deems appropriate. Plaintiff demands a trial by jury.

## INTRODUCTION

In October 2022, while housed at Bibb Correctional Facility, Plaintiff Jerry Oden injured his foot playing basketball. Since then, he has consistently sought treatment for his injury from YesCare Corp., Bibb's healthcare provider, and Dr. Jason Fish, Bibb's lead physician. Had Jerry received timely and minimally adequate care for his injury, he would have healed quickly and regained full mobility and use of his foot. Instead, despite knowing about Jerry's injury, Dr. Fish has delayed and denied Jerry's access to necessary medical treatment for the last two years. Jerry has been in severe pain and unable to put pressure on his foot the whole time. As of the filing of this complaint, Jerry still has not received treatment for his injury.

**PARTIES**

1.      Plaintiff Jerry Oden is a natural person over the age of 19.

2.      Defendant YesCare, Corp. ("YesCare") is a corporate entity licensed to practice business in the State of Alabama.

3.      Beginning on April 1, 2023, YesCare contracted with the Alabama Department of Corrections to provide medical care to individuals in the custody of ADOC, including individuals like Plaintiff who were incarcerated at Bibb Correctional Facility.

4.      Defendant Jason Fish, M.D., is a natural person over the age of 19.

5.      At all relevant times, Dr. Fish was an employee and/or agent of YesCare and worked as a physician at Bibb.

**JURISDICTION AND VENUE**

6.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights.

7.      This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**FACTS**

9.      Plaintiff Jerry Oden has been in the custody of the Alabama Department of Corrections ("ADOC") since November 2019.

10.      At the time of the events that form the basis of this Complaint, Jerry was incarcerated at Bibb Correctional Facility ("Bibb"), located at 565 Bibb Lane in Brent, Alabama.

11.      In or about October 2022, Jerry injured his left foot playing basketball.

12.     After submitting a sick call, Jerry was seen by a doctor in Bibb's Healthcare Unit ("HCU").

13.     Jerry told the doctor that he had injured his foot playing basketball, that it was hurting behind his heel, and that he had a difficult time walking or putting pressure on it.

14.     The doctor wrapped Jerry's foot in an Ace bandage and gave Jerry some ice and a small box of ibuprofen. The doctor said he would schedule Jerry for an x-ray on his foot.

15.     Approximately two weeks later, Jerry was called to the HCU for an x-ray of his foot. He was told that he would be scheduled for another appointment if the x-ray showed any problems.

16.     Jerry was never scheduled for another appointment.

17.     Over the next several months, Jerry's foot continued to get worse. At the time of his injury, he had been able to walk by putting pressure only on his toes, but after several months the pain had increased to the point that he could not put any pressure on his left foot. Jerry submitted another sick call describing his injury and pain.

18.     Jerry was seen by a doctor in the HCU. The doctor said that the x-ray did not show any issues with Jerry's foot. He refused to conduct additional diagnostic tests. The doctor told Jerry that he should not put any pressure on his foot, he wrote Jerry a prescription for ibuprofen, and he sent Jerry back to his dorm. He did not give Jerry any other medical treatment.

19.     Jerry's foot continued to hurt for the next several months. To manage the pain, Jerry walked and stood as little as possible and took ibuprofen whenever he could. Jerry had to quit his job in the kitchen because he could not be on his feet for the periods of time that job required.

20.     In or about early October 2023, after submitting another sick call complaining of the pain in his foot, Jerry was seen by Defendant Dr. Jason Fish.

3

21.     Dr. Fish told Jerry that his pain was the result of an injury to his Achilles tendon.

22.     Dr. Fish knew that, at that time, Jerry's injury was approximately one year old and Jerry had received no treatment for it.

23.     Dr. Fish told Jerry that his foot should be wrapped and put in a cast. He scheduled Jerry for an appointment on October 10, 2023, to get a cast put on.

24.     On October 10, 2023, Jerry went to the HCU for his appointment. Dr. Fish refused to see him. His appointment was rescheduled for the next day, and he was told to leave.

25.     Jerry returned to the HCU the next day. Dr. Fish again refused to see him. His appointment was rescheduled for two days later, and he was told to leave.

26.      Jerry returned to the HCU two days later for his rescheduled appointment. Dr. Fish again refused to see him. Jerry asked to have his appointment rescheduled, but his request was denied, and he was told to leave.

27.     On or about October 20, 2023, Jerry submitted a sick call asking for another appointment to have the cast put on.

28.     Near the end of October 2023, Jerry was seen by Dr. Fish. Dr. Fish wrapped Jerry's foot in an ace bandage and told Jerry he would see him in two weeks. Jerry's follow-up appointment was scheduled for November 13, 2023.

29.     Jerry kept his foot wrapped, but the pain in his foot did not improve.

30.     Jerry went to the HCU for his November 13, 2023 appointment. Dr. Fish took the bandage off Jerry's foot and said he would schedule Jerry for another medical appointment.

31.     On or about December 1, 2023, Dr. Fish put a half cast on Jerry's ankle. He told Jerry to return in two weeks to have the cast removed.

32.     Two weeks after Dr. Fish put the cast on his ankle, Jerry went to the HCU and asked to see Dr. Fish. Dr. Fish refused to see him.

33.     Three days later, Jerry returned to the HCU and again asked to see Dr. Fish. Dr. Fish again refused to see him.

34.     Jerry put in a sick call asking to see Dr. Fish to have his cast removed. He was never scheduled for an appointment.

35.     Around the end of December 2023, the cast broke and was putting pressure on Jerry's foot and causing him pain, so Jerry took the cast off himself.

36.     On or about January 4, 2024, Jerry again went to the HCU and asked to see Dr. Fish. Dr. Fish refused to see him.

37.     On or about January 16, 2024, Jerry's attorney sent a letter to Christopher Gordy, Warden III at Bibb, with copies sent to several other ADOC officials. *See* Ex. 1. The letter detailed Jerry's attempts to that date to receive treatment for his injured foot. *See id.*

38.     Upon information and belief, the January 16, 2024 letter or the information contained in it was forwarded to individuals in Bibb's HCU, including Dr. Fish.

39.     Toward the end of January 2024, Jerry had an appointment with Dr. Fish. Dr. Fish told Jerry he would schedule him for an ultrasound of his foot to diagnose Jerry's injury. Dr. Fish gave Jerry crutches. Jerry asked Dr. Fish to give him a profile indicating that he could not stand for extended periods of time, but Dr. Fish refused.

40.     Jerry was not scheduled for an ultrasound on his foot.

41.     On or about February 8, 2024, Jerry's attorney sent a letter to ADOC's general counsel detailing Jerry's attempts to that date to receive treatment for his injured foot. *See* Ex. 2.

42.     Upon information and belief, the February 8, 2024 letter or the information contained in it was forwarded to individuals in Bibb's HCU, including Dr. Fish.

43.     After several months, Jerry put in a sick call about the ongoing pain in his foot. Jerry saw Dr. Fish. Dr. Fish expressed surprise that Jerry had not had the ultrasound yet. He provided no medical treatment for Jerry's injury.

44.     Jerry again asked Dr. Fish to give him a profile indicating that he could not stand for extended periods of time. Dr. Fish again refused.

45.     As of the filing of this complaint, Jerry has still not received treatment for his foot injury.

46.     In the two years that Jerry has been seeking treatment for his injury, his pain has consistently increased and his mobility has consistently decreased.

47.     As of the filing of this complaint and for at least nine months before, his pain has been constant and severe. His left foot is so swollen and tender that he cannot wear a regular shoe. His left leg often goes numb to a point above his knee.

48.     Jerry cannot walk without crutches because he cannot put any weight on his foot. He spends as much time as he can sitting or lying down. He has difficulty showering because he cannot balance well on one leg. He quit his job in the kitchen because he could not stand for the periods of time that job required.

49.     Failure to timely and sufficiently treat an Achilles injury delays or prevents the injury from healing and may result in lasting disability, including an inability to take part in normal daily activities such as walking, standing, running, or athletic activities.

50.     As a trained physician, Dr. Fish knew that delaying or denying Jerry treatment for his injury would result in ongoing pain and lasting disability.

## COUNT I
### Violation of the Eighth Amendment – Dr. Fish (Individual Capacity)

51.     Plaintiff incorporates by reference paragraphs 1 through 50 of his Complaint.

52.     Dr. Fish was responsible for providing Plaintiff with minimally adequate medical care while Plaintiff was incarcerated at Bibb.

53.     As described above, Dr. Fish was deliberately indifferent to Plaintiff's serious medical needs. His deliberate indifference directly caused Plaintiff significant pain and suffering, lasting disability, and permanent disfigurement.

54.     From the first time he assessed Plaintiff's injury, Dr. Fish knew that Plaintiff had a serious medical need that would not improve without adequate treatment. Nevertheless, Dr. Fish consistently refused to treat Plaintiff, delaying and denying his access to necessary medical care.

55.     Dr. Fish knew that Plaintiff's injury was not improving with the negligible treatment he was giving Plaintiff. Nevertheless, Dr. Fish refused to treat Plaintiff, delaying and denying his access to necessary medical care.

56.     Dr. Fish knew that the full extent of Plaintiff's injury could not be accurately assessed without further diagnostic tests. Nevertheless, Dr. Fish refused to order additional tests for Plaintiff or, in the alternative, delayed ordering those diagnostic tests with no medical justification.

57.     Dr. Fish ignored Plaintiff's reports of constant and severe pain and refused to provide Plaintiff with medical treatment for his pain

58.     Dr. Fish's refusal to treat and/or assess Plaintiff's injury caused Plaintiff significant pain and suffering and has resulted in Plaintiff experiencing a lasting disability and permanent disfigurement.

## COUNT II
### Violation of the Eighth Amendment – YesCare Corp.

59.     Plaintiff incorporates by reference paragraphs 1 through 50 of his complaint.

60.     As the head physician at Bibb, Dr. Fish was a de facto policy maker for YesCare.

61.     YesCare, on its own or, alternatively, through the final policymaking decision of Dr. Fish, had a policy, practice, or custom of delaying or denying incarcerated individuals, including Plaintiff, access to necessary medical treatment in order to minimize costs.

62.     YesCare, on its own or, alternatively, through the final policymaking decision of Dr. Fish, had a policy, practice, or custom of delaying or denying incarcerated individuals, including Plaintiff, access to necessary medical treatment in an effort to discourage incarcerated individuals, including Plaintiff, from seeking medical treatment, all in order to minimize costs.

63.     YesCare, on its own or, alternatively, through the final policymaking decision of Dr. Fish, had a policy, practice, or custom of justifying the delay or denial of medical treatment to incarcerated individuals, including Plaintiff, based on x-ray results, even when an x-ray could not accurately diagnose individuals' injuries, in order to minimize costs.

64.     YesCare, on its own or, alternatively, through the final policymaking decision of Dr. Fish, had a policy, practice, or custom of failing to seek off-site medical care for incarcerated individuals, including Plaintiff, even when off-site medical care is necessary to provide medical treatment for serious injuries, in order to minimize costs.

65.     YesCare, on its own or, alternatively, through the final policymaking decision of Dr. Fish, had a policy, practice, or custom of failing to prescribe to incarcerated individuals, including Plaintiff, medically necessary medications and/or medical equipment in order to minimize costs.

66.    Pursuant to these policies, Dr. Fish and other YesCare medical staff delayed treating and/or failed entirely to treat Plaintiff's foot injury.

67.    Pursuant to these policies, Dr. Fish and other YesCare medical staff delayed diagnosing and/or failed to diagnose the injury to Plaintiff's foot.

68.    Pursuant to these policies, Dr. Fish failed to send Plaintiff to an off-site hospital to receive adequate treatment for his foot injury.

69.    Pursuant to these policies, Dr. Fish refused to treat Plaintiffs' complaints of severe pain except for with intermittent ibuprofen, which Dr. Fish knew was not sufficient to treat Plaintiff's pain.

70.    Because of these policies, as implemented by Dr. Fish, Plaintiff did not receive necessary care for his foot injury.

71.    Because of these policies, as implemented by Dr. Fish, diagnosis and treatment for Plaintiff's foot injury was significantly delayed.

72.    The delay in diagnosis and treatment for Plaintiff's foot injury resulted in Plaintiff suffering severe pain and resulted in a lifelong and significant handicap.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against all the defendants, jointly and severally, and also order as follows:

a.  Find in favor of Plaintiff on all counts;

b.  Enter a preliminary and permanent injunction ordering Defendant YesCare Corp. to provide adequate treatment for Plaintiff's foot injury;

c.  Award compensatory damages to Plaintiff, against all defendants, in an amount to be determined at trial;

d.   Award punitive damages to Plaintiff, against all defendants, in an amount to be
     determined at trial;

e.   Award Plaintiff recovery of attorneys' fees and other costs; and

f.   Award any other relief the Court deems appropriate.

Respectfully submitted this 25th day of October 2024.

*/s/ **Susanne Emily Cordner***_____
Susanne Emily Cordner
(ASB-4687-C61N)
Joseph Mitchell McGuire
(ASB-8317-S69M)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000
scordner@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com

*Attorneys for Plaintiff*